

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-17-00008-CR

_____

SHARON DIANE FINLEY, Appellant

V.

THE STATE OF TEXAS, Appellee

_____

On Appeal from the 54th District Court
McLennan County, Texas
Trial Court No. 2016-345-C2

_____

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Justice Moseley

# MEMORANDUM OPINION

A McLennan County[1] jury convicted Sharon Diane Finley of cruelty to a non-livestock animal (a dog) while using a deadly weapon, and she was sentenced to eight years' confinement. On appeal, Finley contends that (1) the evidence was legally insufficient to support the verdict, (2) the jury charge and the State's argument improperly expanded the indictment, (3) the trial court erred in allowing opinion testimony from lay witnesses, and (4) there was legally insufficient evidence to support the deadly weapon finding.

We find that the evidence was sufficient to support the jury's finding of guilt, but for the deadly weapon finding; that the jury charge did not expand the indictment; and that the trial court was within its discretion to allow the opinion testimony which was presented. However, because the evidence is insufficient to support a deadly weapon finding, we reverse the trial court's judgment and remand the case for a new punishment hearing.

## I.      Factual and Procedural Background

James Smith owned several properties in the Riverview Road area and lived there for about thirty years. His granddaughter, Whitney Griffin (Daniels), and her husband, Matthew Daniels, lived on one of his properties, and the couple had two husky dogs named Thor and Loki. Smith testified that the dogs had a history of getting loose and running away, but Daniels denied that

---

[1]Originally appealed to the Tenth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2013). We are unaware of any conflict between precedent of the Tenth Court of Appeals and that of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

2

Loki and Thor had ever done this before. The dogs wore collars and were implanted with chips, so someone could easily identify the dogs' owners.

On December 19, 2015, Smith saw a white car he did not then recognize and a red truck he noted as belonging to his neighbor, Joel Pizarro,[2] parked in Griffin's driveway, and Smith parked his car behind the white one. Smith saw Pizarro standing near his truck, and he noticed that Thor was in the white car (identified as belonging to Finley) and a woman (later identified as Finley) running after Loki, trying to catch him.

Smith had known Pizarro for twenty years. On occasion, his granddaughter's dogs had gotten loose and caused problems for Pizarro's animals, such as "getting his chickens." However, as Pizarro testified, the two were friends, and he and Smith always resolved their problems by speaking directly to one another. Smith asked Pizarro what was going on with "this woman . . . chasing [his] dogs?" Smith described Finley as acting "rather erratic," "very angry," and "aggressive." Due to the behavior demonstrated by Finley, he decided to not confront her, but, rather, called Griffin and told her to call the police. Because of her rather odd behavior, Smith did not tell Finley who owned the dogs. Since Smith did not believe Finley would be able to catch Loki, Smith returned to his house to tell his daughter what her dogs had done.

Pizarro testified that Finley, a woman he did not know, showed up just before Smith and said she was "coming because of the dogs." Pizarro testified that Finley caught both of the dogs, put them in her car, and drove away. He said it all happened "real fast, in a matter of minutes."

---

[2]The witness' name was Joel Pizarro Castro, but we will refer to him as Pizarro because that is how he is referenced and addressed in the record and briefs.

3

Pizarro had told Finley that the dogs had killed his chickens, but he denied asking her to take the dogs or helping her catch them. Finley never asked Smith or Pizarro who owned the dogs, and no one gave Finley permission to take or kill the dogs.

About an hour after Smith left the scene, he saw Finley's white car return to Griffin's driveway, and when Finley opened the back door, Loki jumped out. Finley then pulled something else out of the car, dropped it in the ditch near the side of the road, and drove away. Smith testified that Finley was wearing shorts and a "bright orange sweatshirt type of -- type of jacket." Smith tried to catch Loki, and when he went to see what Finley had thrown on the side of the road, he saw that it was the other dog, Thor. Smith saw that the dog had been wounded by what he believed was a gunshot near the shoulder, and there was some blood near the dog's mouth. Thor's body was never turned over to the police or a veterinarian, but was buried on the property.

Glenn Kennedy, a patrol deputy with the McLennan County Sheriff's Office, arrived at the Griffin residence in response to a report that someone had stolen two dogs and driven away. Kennedy saw the dead dog and recognized the photographs admitted at trial as State's Exhibits 1–7 as pictures of Thor as Kennedy found him. Based on his training and experience, Kennedy believed the dog's wound to be a puncture wound caused by "a knife, some type of a sharp, flat object."

Finley was suspected by the police officers to have been the woman in the white car, and Kennedy and his partner, Deputy Tyrone Caldwell, began looking for her, eventually finding her behind the wheel of her car, which was not running. Kennedy saw what appeared to be "a lot of blood" and dog hair on the passenger side of the car and dog paw prints all over the seats. He

4

opined that "whatever had taken place was very, very gruesome." Several photographs of the car's interior were admitted into evidence, as was a picture of Finley's blood-covered hoodie. A folding pocketknife was found in the car which (when opened) was found to be covered in what appeared to be dog hair. An ice pick was found in the floorboard of the automobile, but no gun was found. No tests were conducted on the knife or icepick to determine the presence of blood.

Kennedy described Finley's demeanor during the encounter as "[v]ery belligerent. Very upset. Very angry at us." He believed that Finley (who believed that the officers were present with her to investigate a case of her having been assaulted) was under the influence of something. She eventually told the officer that she was "just trying to rescue some dogs," but she seemed surprised that the officers found blood, hair, and paw prints in the back seat of her car.

Barbara Roscher was driving home with her coworker, Kathleen Craver, when they saw a horse being chased by a dog that turned out to be Loki. They saw a car stopped on the side of the road, and behind the car, lying on the ground, was another dog. Craver "thought maybe it was her dog that got hit" by a car. A woman was standing against the trunk, and she appeared to be upset, so Roscher pulled over to see if they could help.

Not knowing that the dogs did not belong to Finley, Roscher caught Loki and put him in the front seat of Finley's car, while Craver helped to put Thor in the back seat. In moving Thor, Craver neither got blood on herself nor recalled seeing any blood in the back seat area of Finley's car. Craver testified that even though she did not see any blood or any obvious injuries on the dog, she "could see that his eyes were glazing over and his breathing was very erratic." Roscher testified that Thor had blood on his mouth and appeared to be "pretty hurt," but when asked if she

5

saw any other blood on the dog, she said, "It looked perfectly fine on the street." Roscher and Craver described Finley as "paralyzed upset" and "so distraught." Finley followed Roscher's car to an emergency animal clinic, but Thor died before they arrived, so the animal was not taken into the clinic, and the two cars drove away separately.

Roscher and Craver identified Thor as the dog in State's Exhibit 1, but neither of the women remembered seeing a wound on the dog when they saw him previously, although Roscher admitted that there could have been a wound on the animal's other side. Neither she nor Craver saw how the dog was initially injured.

Finley testified that her mother lived near Riverview Road and that Finley would run errands for her because her mother did not have a car. Having done so and after leaving her mother's house, she saw two dogs running across the road. Since she worked with the Humane Society and different dog rescue groups, she wanted to stop and try to help the dogs and to find their owners. When she pulled into Griffin's driveway following the dogs, she saw that one of them had a chicken in its mouth. She testified that she started helping Pizarro (whom she did not know) catch the dogs. She put them in her car, and, intending to find the dogs' owner, she knocked on the door of Griffin's house and that of the neighbor's house, but no one answered either knock. Finley did not recall seeing Smith at the scene, but when confronted with Smith's earlier testimony, she recalled that there was a man at the scene who was talking on his cell phone.

Finley drove away, intending to drive to a friend's house to see if he could hold the dogs until their owners could be found, and she also had "a friend that has a chip checker." When she arrived and opened the door of her car, the dogs took off and ran across the nearby highway. She

6

was unable to catch them and eventually saw that one of the dogs was lying on the side of the road, bleeding from its mouth, which greatly upset her because she was an animal lover. Her testimony of the trip to the veterinarian was substantially similar to that of Roscher and Craver, but when asked why she had not used the chip reader at the veterinary clinic to identify the dogs' owners, she said she was so distraught that she did not think about it.

Leaving the veterinarian's office, Finley drove the dogs back to the place she had originally found them, letting Loki run out of the car, and hoping that the owners would find the dead dog and bury it, because, she said, "[I]f it was mine, I would want to bury it." Finley denied that she was wearing the orange hoodie when she returned the dogs and denied that Thor had any wounds when she left it at the scene. She did not see where Loki went, and by that point, she "was so distraught . . . and upset that the dog got hit and [run] over [that she ] just left."

Upon seeing the police recording of her arrest, Finley apologized for her demeanor and behavior, because at the time, she did not understand why she was being arrested for animal cruelty. She admitted to having been previously convicted for forgery and giving a false statement to an officer. Finley denied having harmed the dog, denied seeing any wounds on the animal, and surmised that the wound shown in the photographs had to have happened after she left him by the side of the road. She explained that she had taken the hoodie off and put it in the back seat of her vehicle prior to the dog being hit by the car; she indicated that the blood in her car and on the hoodie came from the dog lying in the backseat on the way to the veterinarian's office. She disputed the testimony of Roscher and Craver that there was no blood in her car.

Asked why she had not taken the dogs to the Humane Society, Finley responded that it was not open, but when confronted with Daniels' earlier testimony that he had gone to the Humane Society that same day, Finley said, "Yeah. But I don't take dogs to the Humane Society." She was aware that the Humane Society had a chip reader and that it was only ten minutes away, but she opted not to take the dogs there because she "wanted to try to find the owners." She claimed to have knocked on the door of Griffin's neighbor's house, and testimony revealed that to be Smith's house. Asked to explain how, if Smith had left the scene and returned home before she left the scene, she did not find him there, Finley said, "He may have been in the back."

The jury found Finley guilty of cruelty to a non-livestock animal while using or exhibiting a deadly weapon. Finley was sentenced to eight years in prison. She timely filed this appeal.

## II.     There Was Legally Sufficient Evidence to Support the Verdict

In her first point of error, Finley contends that the evidence was insufficient to support the verdict because "[t]he State failed to prove what killed the dog."

In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in

testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The "hypothetically correct" jury charge is "one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*.

A person commits the offense of cruelty to a nonlivestock animal if she intentionally, knowingly, or recklessly "(1) tortures an animal or in a cruel manner kills or causes serious bodily injury to an animal; [or] (2) without the owner's effective consent, kills, administers poison to, or causes serious bodily injury to an animal." TEX. PENAL CODE ANN. § 42.092(b)(1), (2) (West 2016). An animal includes any "domesticated living creature" (this would be such an animal as a dog or cat but not one domesticated as livestock). TEX. PENAL CODE ANN. § 42.092(a)(2) (West 2016). "Cruel manner' includes a manner that "causes or permits unjustified or unwarranted pain or suffering," and "[t]orture" is "any act that causes unjustifiable pain or suffering." TEX. PENAL CODE ANN. § 42.092(a)(3), (8) (West 2016).

Here, the State disjunctively pled and was, therefore, required to prove that Finley either (a) intentionally, knowingly, or recklessly tortured or killed a dog by stabbing, cutting, or shooting, and used a deadly weapon, to-wit, a gun, a knife, an ice pick, an unknown sharp object, or

9

(b) intentionally, knowingly, or recklessly killed a dog by stabbing, cutting, or shooting, without the effective consent of the owner, and used a deadly weapon, to-wit, a gun, a knife, an ice pick, or an unknown sharp object. Tracking the indictment, the jury charge set forth a single, specific statutory offense—cruelty to non-livestock animals—and included alternate manner and means of committing that offense. Alternate manner and means of committing the same offense may be submitted to the jury without violating the right to a unanimous jury verdict. *Martinez v. State*, 129 S.W.3d 101, 103 (Tex. Crim. App. 2004). There is no requirement that the jury designate which of the alternate manner and means of committing the specific offense they found to be proven. *Landrian v. State*, 568 S.W.3d 532, 535 (Tex. Crim. App. 2008).

Here, the evidence is legally sufficient to support the verdict. The evidence is undisputed that Finley took the dogs and later returned one of them dead. The testimony of Smith and Kennedy, along with photographs taken at the scene, support a finding that Thor sustained a puncture-type wound prior to being returned deceased to the Griffin property. Smith believed the wound was caused by a gunshot, but Finley was not found with a gun on her person or in her car. Kennedy testified that the puncture-type wound was caused by a flat, sharp object, like a knife. A knife and an ice pick were found in Finley's car. The knife had what appeared to be dog hair on it. Smith saw her wearing a bloody hoodie when she returned the dead dog, and Daniels testified that no one ever gave Finley permission to take or kill the dog.

Though Finley testified that Thor died due to being struck by a car, the jury was free to disbelieve that testimony and free to believe the testimony of Smith and Kennedy, who did not believe that the dog's wound was caused by being hit by a car. *See Hooper*, 214 S.W.3d at 13.

10

Finley's hoodie and the seat in her car were smeared with blood. Neither Roscher nor Craver recalled seeing a wound on the dog or blood in the car when they put the dogs in Finley's car, and therefore, the jury could have reasonably inferred that the dog was stabbed inside Finley's car either during the trip to the veterinarian's office or after Finley left that place, as Finley was alone in the car with the animal during those times. Based on that, the jury could have rejected being struck by a car as the concurrent cause of Thor's injury and death.

Finley claimed she was trying to protect the dogs and find their owners, but Thor was accidentally killed when he was struck by a car. The jury could have found her testimony not credible for various reasons. Despite her stated goals, while she was at the veterinarian's office, she failed to have the dogs checked to see if they had an implanted microchip, and likewise failed to take them to the Humane Society. Rather than ask the two men present at Griffin's house about the ownership of the dogs, she put them in her car and drove away. Similarly, when returning Thor's body, she failed to ask the nearby homeowners about the dog's owner or offer either an explanation of its demise or condolences. When questioned by the police, she had little to say regarding the dogs and offered no explanation for the blood in her car. Moreover, her testimony regarding catching the dogs and the operating hours of the Humane Society were contradicted by Pizarro and Daniels, respectively.

Based on the foregoing, the jury could have reasonably concluded that Finley intentionally, knowingly, or recklessly killed Daniels' dog by stabbing it with a knife or other sharp object. *See* TEX. PENAL CODE ANN. § 42.092(b)(2). Therefore, there is legally sufficient evidence supporting the verdict, and we overrule this point of error.

11

### III. The Indictment Was Not Improperly Expanded

In her second point of error, Finley argues that the jury charge and the State's argument improperly expanded the indictment.

We employ a two-step process in our review of alleged jury charge error. *See Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). "Initially, we determine whether error occurred and then evaluate whether sufficient harm resulted from the error to require reversal." *Wilson v. State*, 391 S.W.3d 131, 138 (Tex. App.—Texarkana 2012, no pet.) (citing *Abdnor*, 871 S.W.2d at 731–32).

"[T]he jury is the exclusive judge of the facts, but it is bound to receive the law from the court and be governed thereby." TEX. CODE CRIM. PROC. ANN. art. 36.13 (West 2007). "A trial court must submit a charge setting forth the 'law applicable to the case.'" *Lee v. State*, 415 S.W.3d 915, 917 (Tex. App.—Texarkana 2013, pet. ref'd) (quoting TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007)). "The purpose of the jury charge . . . is to inform the jury of the applicable law and guide them in its application. It is not the function of the charge merely to avoid misleading or confusing the jury: it is the function of the charge to lead and prevent confusion." *Id.* (quoting *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007)).

The level of harm necessary to require reversal due to jury charge error is dependent upon whether the appellant properly objected to the error. *Abdnor*, 871 S.W.2d at 732. Here, because Finley did not object to the charge, we will not reverse unless the record shows the error resulted in egregious harm, *see Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g)), such that she did

12

not receive a fair and impartial trial. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g); *Loun v. State*, 273 S.W.3d 406, 416 (Tex. App.—Texarkana 2008, no pet.). "Jury-charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007). In making this determination, we review "the entire jury charge, the state of the evidence, the argument of counsel, and any other relevant information in the record as a whole." *Villarreal v. State*, 205 S.W.3d 103, 106 (Tex. App.—Texarkana 2006, pet. ref'd, untimely filed) (citing *Almanza*, 686 S.W.2d at 171). Direct evidence of harm is not required to establish egregious harm. *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996).

In this case, the indictment alleged two of the statutory alternative means for committing animal cruelty: that Finley committed animal cruelty (a) by torturing or in a cruel manner killing the dog by stabbing and/or cutting and/or shooting it and (b) by killing the dog by stabbing and/or cutting and/or shooting it without the effective consent of the dog's owners. *See* TEX. PENAL CODE ANN. § 42.092(b)(1), (2). At trial (among several arguments), Finley presented a concurrent causation alternative—that the dog's injuries and/or death were caused when another vehicle struck the dog. Without objection, the trial court included in its charge to the jury the statutory concurrent-causation language found in Section 6.04(a) of the Texas Penal Code: "A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." TEX. PENAL CODE ANN.

13

§ 6.04(a).  Finley contends that this instruction allowed the State, through its argument, to improperly expand the indictment to allow for a conviction on unalleged grounds.

The "but for" causation referenced in Section 6.04(a) must be established between an accused's conduct and the resulting harm.  *See Robbins v. State*, 717 S.W.2d 348, 351 (Tex. Crim. App. 1986).  When concurrent causes are present, the "but for" requirement is satisfied when either (1) the accused's conduct is sufficient by itself to have caused the harm or (2) the accused's conduct, coupled with another cause, is sufficient to have caused the harm.  *Id*.  But if an additional cause, other than an accused's conduct, is clearly sufficient by itself to produce the result and the accused's conduct by itself is clearly insufficient, then the accused cannot be convicted.  *Id*. Whether such a causal connection exists is a question for the jury's determination.  *See Hardie v. State*, 588 S.W.2d 936, 939 (Tex. Crim. App. [Panel Op.] 1979); *Thomas v. State*, 756 S.W.2d 59, 61 (Tex. App.—Texarkana 1988, pet. ref'd).  As such (except for cases in which the evidence of each concurrent cause involves the defendant's conduct), when evidence of concurrent causes is presented at trial, a charge instruction based on Section 6.04(a) is appropriate.  *Haley v. State*, 396 S.W.3d 756, 767 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

Finley relies primarily on the Texas Court of Criminal Appeals' decision in *Otto v. State*, 273 S.W.3d 165 (Tex. Crim. App. 2008), wherein the defendant, Otto, argued at trial that even though she had consumed two glasses of wine on the night she was charged to have been intoxicated, she believed that a male friend had "put some unknown drug" into the soda that she averred she had been drinking after consuming the two glasses of wine.  *Id*. at 166.  In response to her evidence, the trial court's charge included language that tracked Section 6.04(a) even though

14

the indictment alleged only that Otto was intoxicated "by the reason of introduction of alcohol into" her body. *Id.* at 166. Notably, there was no evidence of other concurrent-cause, physical acts (i.e., no other drivers or vehicles involved in the fatal accident other than Otto's and the victim's). *See id.* The court reasoned that because the State had alleged intoxication by alcohol alone, the jury charge that included the concurrent-causation instruction left open the possibility that the jury could have convicted Otto for having been intoxicated "by a combination of alcohol and the unknown drug." *Id.* at 171. The court held that under those facts, the inclusion of language that tracked Section 6.04(a) improperly expanded the State's allegations. *Id.* at 170.

The facts of this case are not similar to those found in *Otto*. At trial, Finley argued in part that Thor was struck by a vehicle, an intervening or concurring cause that was responsible for the dog's injuries and death. So, unlike in *Otto*, there was some evidence here of other acts or circumstances that could have concurrently caused the dog's injuries or death. This case exhibits the very type of evidence that Section 6.04(a) was designed to address (as in the presence of evidence of a concurrent cause, a defendant is criminally responsible unless her conduct was "clearly insufficient" to have caused the result). *See* TEX. PENAL CODE ANN. § 6.04(a) (West 2011).

Finley has failed to show that the inclusion of the complained-of language improperly expanded the State's allegations against her.[3] Thus, the trial court did not err by including Section 6.04(a)'s language in its charge, and we overrule this point of error.

---

[3]To the extent that Finley complains of the State's improper jury argument, the error was not preserved for our review. *See Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996).

**IV.** **The Trial Court Did Not Err in Admitting Opinion Testimony from Lay Witnesses**

In her third point of error, Finley contends that the trial court erred in allowing two lay witnesses, Smith and Kennedy, to testify to their opinion as to what caused the dog's wound.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). Abuse of discretion occurs only if the decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g). We may not substitute our own decision for that of the trial court. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). We will uphold an evidentiary ruling if it was correct on any theory of law applicable to the case. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

Rule 701 of the Texas Rules of Evidence provides that a lay witness may testify in the form of an opinion if (1) the opinion is rationally based on the witness' perception and (2) the opinion is helpful to clearly understanding the witness' testimony or to determining a fact in issue. A trial court must evaluate both requirements when deciding whether a lay witness' testimony is admissible under the rule. *Fairow v. State*, 943 S.W.2d 895, 898 (Tex. Crim. App. 1997).

The initial requirement that an opinion must be rationally based on the perceptions of the witness is itself composed of two parts. *Id.* First, the witness must establish personal knowledge of the events from which his opinion is drawn. *Davis v. State*, 313 S.W.3d 317, 349 (Tex. Crim. App. 2010). Personal knowledge will often come directly from the witness' senses and experiences. *Fairow*, 943 S.W.2d at 898. "An opinion will satisfy the personal knowledge

16

requirement if it is an interpretation of the witness' objective perception of events." *Id*. at 899. Second, once the perception requirement is satisfied, the trial court must then determine if the witness' opinion is rationally based on that perception. *Id*. at 899–900. "An opinion is rationally based on a perception if it is an opinion that a reasonable person could draw under the circumstances." *Id*. at 900. The witness' testimony can include beliefs or inferences as long as they are drawn from his own experiences or observations. *Osbourn v. State*, 92 S.W.3d 531, 535 (Tex. Crim. App. 2002).

The second requirement for admissibility under Rule 701 is that the opinion must be helpful to the trier of fact in either clearly understanding the witness' testimony or in determining a fact in issue. *Fairow*, 943 S.W.2d at 900. There is no bright-line rule for indicating when an opinion is helpful, but general evidentiary considerations of relevance and balancing may assist the trial court in making the determination. *Id*.

On the day in question, Smith found the dog in the ditch and saw its wound. The trial court overruled Finley's objections and allowed Smith to testify that he believed the dog's wound was a gunshot wound. While admitting he was not a veterinarian, Smith described himself as a hunter and a "general country boy." He testified that he had worked with a lot of different animals, including cows, horses, dogs, and cats, that he had experience with injured animals or those with medical issues, and that he had "put down" animals for veterinary reasons. During his life, he had seen both gunshot and stab wounds to animals, and he knew what they looked like. Based on that experience, Smith testified that the wound was a puncture-type wound, specifically a gunshot

wound. Smith testified that he had seen dogs that had been hit by cars and that Thor's wounds were not consistent with being hit by a car.

Kennedy also saw the dog's body lying in the ditch. He testified that photographs of the dog and the wound sustained by it accurately portrayed what he observed that day on the scene. He indicated that he had training and experience with various types of injuries, including puncture wounds, and he could tell the difference between a puncture wound and a wound caused by blunt force. Although Finley objected, Kennedy was allowed to testify that he was trained to identify a gunshot wound, and that based on his training experience, Thor's wound was a puncture wound which appeared to be "made by a knife, some type of a sharp, flat object."

Here, both Smith and Kennedy personally saw the dog in the ditch as well as the photographs of the wound admitted at trial, establishing that they were each familiar with the wound on the dog. *See Davis*, 313 S.W.3d at 349. Smith testified to years of experience with animals and their wounds, and Kennedy testified of his training and experience in identifying wounds and their causes. Based on the evidence in the record, a reasonable person could draw the same opinions under the circumstances. *See Fairow*, 943 S.W.2d at 900. Therefore, their opinions were rationally based on their respective perceptions. *See* TEX. R. EVID. 701(a); *Fairow*, 943 S.W.2d at 898. The opinion testimony was helpful to the trier of fact because it went directly to the main issue of fact which had been pled and which had to be proven in the case: that Finley had either tortured or killed the dog by stabbing, cutting, or shooting it. *See* TEX. R. EVID. 701(b); *Fairow*, 943 S.W.2d at 900. Based on the foregoing, the trial court was within its discretion to admit the opinion testimony over Finley's objections, and we overrule this point of error.

**V.      The Evidence Was Legally Insufficient to Support the Deadly Weapon Finding**

In her final point of error, Finley argues that the evidence is insufficient to support the finding that she used or exhibited a deadly weapon in the course or commission of the offense.

Prior to trial, both paragraphs of the indictment were amended, without objection, to include an allegation that Finley "did then and there use or exhibit a deadly weapon, to-wit: a gun and/or a knife and/or an ice pick and/or an unknown sharp object." The jury found Finley guilty of animal cruelty, and it made an affirmative finding that Finley had used or exhibited a deadly weapon, as alleged in the indictment. However, the deadly weapon in this case was allegedly used against a dog, and "the evidence is insufficient to support a deadly weapon finding under circumstances in which the sole recipient or being against whom a deadly weapon was used or exhibited was a nonhuman." *Prichard v. State*, No. PD-0712-16, 2017 WL 2791524, at \*1 (Tex. June 28, 2017).

Based on the holding in *Prichard*, we modify the trial court's judgment by deleting the finding of the use of a deadly weapon. *See* TEX. R. APP. P. 43.2; *Prichard*, 2017 WL 2791524, at \*1; *Rhoten v. State*, 299 S.W.3d 349, 356 (Tex. App.—Texarkana 2009, no pet.). The deadly weapon finding increased the punishment range from that of a state jail felony (which calls for a punishment range of incarceration from 180 days to two years) to that of a third degree felony (which has a punishment range of between two years' and ten years' incarceration). TEX. PENAL CODE ANN. § 12.34 (West 2011), § 12.35(c)(1) (West Supp. 2016), § 42.092(c) (West 2016). In the absence of that finding, Finley's state jail felony offense would no longer be punishable as a third degree felony. *See* TEX. PENAL CODE ANN. §§ 42.092(c), 12.35(c)(1); *see also Prichard*,

2017 WL 2791524, at *11.  Therefore, we reverse the judgment and remand the case to the trial court for a new sentencing hearing under the punishment range for a state jail felony.


Bailey C. Moseley
Justice

Date Submitted:     July 19, 2017
Date Decided:       October 18, 2017

Do Not Publish